DALE ROBINSON,

        Plaintiff,

        v.                              Case No. 23-C-1622

CANDACE WARNER, et al.,

        Defendants.

**DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND GRANTING DEFENDANTS' MOTION TO DISMISS FOR LACK OF JURISDICTION**

Plaintiff Dale Robinson, a prisoner at the Fox Lake Correctional Institution, is proceeding on an Eighth Amendment deliberate indifference claim, as well as a state law negligence claim, in connection with allegations that Defendants Candace Warner, Karl Hoffmann, Don Strahota, Tara Fredlund, Scott Hoftiezer, and Kathryn Williams failed to treat his deformed feet at the New Lisbon Correctional Institution. ECF Nos. 1 & 6. On February 12, 2025, Defendants Hoftiezer and Williams filed a motion to dismiss for lack of jurisdiction based on Wisconsin's statute of limitations. ECF Nos. 29 & 30. Plaintiff did not file a response to the motion despite the Court providing five extensions of time to do so. *See* ECF Nos. 31-38. Accordingly, the Court will grant the motion as unopposed and as a sanction for non-compliance with the Civil Local Rules. *See* Civ. L. R. 7 (b) (E.D. Wis.) ("Failure to respond to the motion may result in the Court deciding the motion without further input from the parties."); *see also* Civ. L. R. 7 (d) ("Failure to comply with the briefing requirements in Civil L. R. 7(a)-(b) may result in sanctions up to and including the Court denying or granting the motion."). The remainder of the Defendants filed a motion for

summary judgment on the merits on February 12, 2025. ECF No. 19. Because Plaintiff has failed to produce evidence from which a reasonable jury could conclude that Defendants were deliberately indifferent, the Court will grant Defendants' motion for summary judgment and will dismiss this case.

## FACTS

At the relevant time, Plaintiff was an inmate at the New Lisbon Correctional Institution (NLCI). ECF No. 20, ¶2. Defendants are Health Services Unit Manager (HSM) Candace Warner, Dr. Karl Hoffmann, Institution Complaint Examiner (ICE) Tara Miller (formerly Tara Fredlund), and Warden Donald Strahota. *Id*., ¶¶3, 5, 8, & 10.

Plaintiff has been in and out of Department of Corrections (DOC) custody since 1995. ECF No. 37, ¶80. Since that time, Plaintiff has had deformed feet, which he describes as feet that cannot be put flat on the floor. *Id*. Plaintiff's foot condition causes difficulty walking because he has to walk on the inside of his feet and it causes daily pain and discomfort. *Id*., ¶¶100 & 135. This lawsuit involves Plaintiff's experience at the NLCI, where he was located between November 11, 2014 and September 11, 2018. ECF No. 38, ¶1; *see also* WISCONSIN INMATE LOCATOR, available at https://appsdoc.wi.gov/lop/.

On October 13, 2014—about one month before Plaintiff arrived at NLCI—Plaintiff saw UW Orthopedic Surgeon Dr. Kathryn Williams for an appointment in connection with his feet. ECF No. 20, ¶76. Plaintiff reported that he has always had flat feet, which caused pain and discomfort. *Id*. Dr. Williams had a long discussion with Plaintiff about the anatomy of the foot and foot alignment—i.e. "congenital pes planovalgus and hindfoot valgus deformities"—and she requested a CT scan of his ankle/midfoot to better assess bone alignment. *Id*., ¶77. She recommended a pair of chukka boots to provide foot/ankle stability; she approved his request for

2

"tall work boots;" and she suggested a follow-up appointment at the clinic after completing a CT scan to discuss possible surgical options. *Id.*

About two months later, on December 22, 2014, Plaintiff saw Dr. Williams again for a follow-up visit. *Id.*, ¶79. At that appointment, Plaintiff reported no pain but that he still did not have the boots approved at the last appointment. *Id.* Dr. Williams reviewed Plaintiff's CT scan and suspected that surgical realignment may be necessary given the rigidity of his deformity. *Id.*, ¶81. She noted that the surgery would require a complex "a 2-stage procedure," which would include realignment then fusion. ECF No. 26-1 at 73. But because she could not pin-point where in the foot the pain was coming from, she recommended a talonavicular joint anesthetic injection under fluoroscopy. ECF No. 20, ¶82. This procedure narrows down the location of the pain, so she could create an appropriate surgical plan for the correct issue and location on the foot. *Id.*, ¶¶82 & 102. Dr. Williams and Plaintiff also talked about the very long recovery time for foot surgery—at least three months of non-weight bearing and nine months to a year of additional recovery. *Id.*, ¶83. Because Plaintiff did not yet have the boots ordered at the prior appointment, the first line of treatment at that time was still conservative treatment (i.e. appropriate footwear). *Id.*, ¶80. Progress notes indicated that, "We will see [Plaintiff] back in the clinic after injection." ECF No. 26-1 at 73.

On March 18, 2015, Plaintiff had a consultation with UW Health, where gel cushion inserts were recommended. ECF No. 26-1 at 76. On May 6, 2015, Plaintiff had a nurse sick call for complaints of foot pain. ECF No. 20, ¶84. The Provider reviewed with Plaintiff his March 18 consultation; and Plaintiff was provided education on how to use the gel cushion inserts. ECF No. 26-1 at 76.

3

In June 2015, Plaintiff saw Dr. Hoffman for an appointment regarding his feet.  ECF No. 20, ¶85.  Progress notes indicate that Plaintiff "had an injection L foot under fluoroscopic guidance" and that he "needs a pair gel insert 16 x 6E to fit his boots."  ECF No. 26-1 at 94.  Dr. Hoffman noted that while surgery was identified as a possible treatment option, Dr. Williams had noted that a surgery would likely require a two-stage procedure of realignment and fusion and a very long recovery.  ECF No. 20, ¶85.  Plaintiff continued filing Health Service Requests (HSRs) complaining about his feet, and on June 29, 2015, Plaintiff refused to be seen for an appointment for his feet stating that he "dont need to be seen."  *Id*., ¶87.  Plaintiff states, "I refused because HSU visits did not bring me any closer to surgery."  ECF No. 37, ¶87.

On July 24, 2015, Plaintiff saw HSM Warner for a nurse sick call in connection with his feet.  ECF No. 20, ¶88.  Plaintiff reported that he rode a bike nine hours/week; and HSM Warner informed him he should continue to ride the bike to alleviate pain.  ECF No. 26-1 at 80.  Plaintiff requested memory foam and thicker shoe inserts.  *Id*.  HSM Warner told him that, because he had returned his shoe inserts, they would have to be reordered.  *Id*.  She also ordered Tylenol.  *Id*.

In November of 2015, Dr. Hoffmann referred Plaintiff for a consultation with a Mile Bluff Medical Center (MBMC) podiatrist.  ECF No. 20, ¶89.  Plaintiff saw the MBMC podiatrist, on December 8, 2015, and he recommended conservative treatment with custom molded orthotics and inserts.  *Id*., ¶89.  He also recommended a referral to podiatry at Gundersen Health System (GHS) because UW Orthopedics had already determined the two-stage foot surgery was not necessary.  *Id*., ¶91.

In January 2016, Dr. Hoffmann referred Plaintiff for a consultation with a GHS podiatrist (as recommended by the MBMC podiatrist).  *Id*., ¶90.  Plaintiff went to the appointment, on February 16, 2016, and reported pain at a 0/10 due to him wearing Nike high-top shoes.  *Id*.  The

4

GHS podiatrist recommended Plaintiff continue wearing his high-top shoes with accommodative custom insoles. *Id.*, ¶89. He suggested a referral to Dr. Roukasis, if pain continued. ECF No. 26-1 at 68. GHS podiatry agreed to see Plaintiff on an "as needed" basis. ECF No. 20, ¶89.

On February 29, 2016, HSM Warner sent Plaintiff a letter regarding his custom insoles. *Id.*, ¶91. She informed Plaintiff that he had an upcoming podiatry appointment scheduled at the end of March 2016 for his customized orthotics. *Id.*, ¶92. In March 2016, Plaintiff received his customized orthotics, and in April 2016, Plaintiff complained that his feet were getting worse. *Id.*, ¶93.

Between May 2016 and December 2016, Dr. Hoffmann continued to make multiple referrals to facilitate off-site appointments for his feet, including to Dr. Roukasis (as suggested by GHS podiatry). *Id.*, ¶94. Plaintiff had off-site appointments on May 19, 2016, June 1, 2016, July 19, 2016, and September 13, 2016. ECF No. 26-1 at 61-65. In June 2016, following a GHS podiatrist surgical consultation, the podiatrist recommended continued conservative treatment via shoe gears support and orthotic correction, as well as seeing a physical therapist for Plaintiff's Achilles tendon. ECF No. 20, ¶93.

In January 2017, Plaintiff saw a GHS podiatrist, who recommended ordering shoes with Velcro strap support system. *Id.*, ¶98. In March 2017, Dr. Hoffmann continued facilitating off-site orthopedic consultations for Plaintiff to explore the possibility of surgical treatment. *Id.*, ¶99. He also ordered a tub to soak his feet. ECF No. 26-1 at 25.

On June 26, 2017, Plaintiff saw Dr. Williams again. ECF No. 20, ¶¶100 & 101. Plaintiff reported that he had found a pair of shoes that "feel like heaven" and he denied having pain on a daily basis. *Id.* Dr. Williams noted that at his last visit, Plaintiff was supposed to undergo a talonavicular joint anesthetic and steroid injection for diagnostic and therapeutic purposes and for

5

possible surgical planning. *Id.* She learned that Plaintiff went to the injection appointment but was not having pain at that time, so he did not get the injection. *Id.* Plaintiff's lack of pain was a problem because, if Plaintiff was not experiencing any pain, there would be no way to differentiate between the pain he experienced and the effect of the anesthetic, rendering the injection and diagnostic test useless. *Id.*, ¶103. Dr. Williams also took updated x-rays, which showed no changes to his feet. *Id.*, ¶105. Given that Plaintiff had found shoes that alleviated his pain, and given the risks and uncertainties associated doing a surgery without knowing the exact source of the pain, Dr. Williams did not feel that surgery was in Plaintiff's best interest at that time. *Id.*, ¶108. Additionally, given that Plaintiff also denied having pain on a daily basis, the risk of surgery did not outweigh the benefit. *Id.* She noted that Plaintiff was free to get a second opinion. *Id.*, ¶110. She recommended that Plaintiff be allowed to order and wear the LeBron 14 high-top shoe in a size 17 and that whatever color is necessary to obtain that size and style be allowed in the facility. *Id.*, ¶111. She made this order, in part, because Plaintiff was confrontational, argumentative, and demanding in connection with the shoe he wanted at the appointment. *Id.*, ¶¶106 & 107. Dr. Williams did not see Plaintiff again after that appointment. *Id.*, ¶112.

In July 2017 and August 2017, Plaintiff sent HSRs asserting that conservative treatments were not working, that it had been three years, and that he wanted surgery. ECF No. 36 at 4. HSM Warner sent Plaintiff a letter, on July 6, 2017, telling him that Dr. Hoffmann would contact the two doctors at UW who perform foot and ankle surgery to see whether they will see him. ECF No. 20, ¶113. She asked Plaintiff to be patient and, if he wished to be seen in HSU, he should submit an HSR. *Id.* The request to be patient stemmed from the fact that Dr. Williams was the only surgeon who had a pending contract with the DOC to perform the type of surgery Plaintiff wanted. *Id.*, ¶146. Finding a different surgeon would require additional time and levels of

approval; and Plaintiff had a history of losing patience, sending threatening/hostile correspondence, and becoming loud, argumentative, and aggressive towards medical staff. *Id*., ¶¶69, 124, & 147. On July 27, 2017, Dr. Hoffmann requested a consultation with either Dr. Kurt Rongstad or Dr. Ronald Guiao (both orthopedic foot specialists) for surgery on his extremely flat feet. *Id*., ¶114. On July 28, 2017, Dr. Hoffman requested a consultation with the Black River Falls Orthotist for special shoes for extremely flat feet. *Id*., ¶115. On August 30, 2017, Plaintiff had a nurse sick call for complaints of pain to his feet. *Id*., ¶116. The nurse scheduled a doctor's appointment for the following week. ECF No. 26-1 at 83 & 84. In September 2017, Dr. Hoffmann continued facilitating off-site consultation with different providers for Plaintiff to explore the possibility of a surgical treatment. ECF No. 20, ¶117. Dr. Hoffman was unsuccessful in finding surgeons willing to accept a consultation or complete surgery. *See* ECF No. 26-1 at 52.

Between October 2017 and November 2017, Dr. Hoffmann continued to see Plaintiff to assist him in finding shoe gears that may provide him better support. ECF No. 20, ¶120. On October 3, 2017, HSM Warner and Dr. Hoffmann discussed Plaintiff's foot pain. *Id*., ¶119. Dr. Hoffmann stated he would present Plaintiff's case at the next clinical review committee conference call. *Id*. HSM Warner notified Plaintiff of this. *Id*. On October 4, 2017, Dr. Hoffmann submitted a Prior Authorization for Therapeutic Level of Care Referral to the Class III committee. *Id*., ¶118. Specifically, Dr. Hoffmann explained that Plaintiff wanted surgery to correct his feet, but he was unsuccessful in finding orthopedic surgeons willing to perform surgery. *Id*. UW and Meriter Hospitals in Madison said no; and he was considering Froedtert Hospital in Milwaukee next. ECF No. 26-1 at 52. Dr. Hoffman noted that Plaintiff may have "burned his bridges" due to his behavior at prior consultations. *Id*. The Class III committee responded that Dr. Hoffman should continue "conservative treatment" options as recommended by multiple off-site specialist podiatrists. *Id*.

On October 17, 2017, Plaintiff received custom shoes from Winkley Orthotics & Prosthetics. *Id*. at 9.

On December 7, 2017, Plaintiff had a nurse sick call for complaints of foot pain. ECF No. 20, ¶121. Plaintiff was given a medical restriction to order shoes from East Bay, additional education, and he scheduled for another appointment with Winkley Orthotics & Prosthetics. ECF No. 26-1 at 90. On December 29, 2017, Plaintiff had a nurse sick call for complaints of foot pain. ECF No. 20, ¶122. He was scheduled for an appointment with a doctor the following week and an offsite appointment in January 2018. ECF No. 26-1 at 92. HSM Warner also informed Plaintiff that she spoke with Warden Strahota, who advised that he was to order and try shoes available in the vendor catalog. ECF No. 20, ¶123.

In January 2018, Dr. Hoffmann ordered low bunk and low tier restrictions to limit the stress on Plaintiff's feet. *Id*., ¶125. On January 19, 2018, HSM Warner spoke with the Bureau of Health Services (BHS) Central Office regarding Plaintiff's request for shoes and surgery. *Id*., ¶126. BHS told her to wait for the appointment with Winkley Orthotics & Prosthetics and go from there. *Id*. On January 24, 2018, HSM Warner called Traiden Oleson at Winkley Orthotics & Prosthetics. *Id*., ¶127. She told Mr. Oleson that Plaintiff had an appointment with them on January 31, 2018 and that he was requesting Jordan high tops and Lebron Soldier shoes. *Id*. Plaintiff also wanted his black high-top shoes adjusted. *Id*. HSM Warner told Mr. Oleson that, if he was unable to adjust the black high-top shoes, he should give the DOC the specific shoes they needed to purchase – high top, Velcro/no Velcro, manufacture, etc. – not name brand – and HSU would go from there. *Id*.

On February 1, 2018, HSM Warner emailed to BHS Plaintiff's shoe information from his January 31, 2018 appointment. *Id*., ¶128. On February 19, 2018, Dr. Hoffman allegedly stated

that he "can't manufacture another surgeon" and that he would continue conservative treatments. ECF No. 37, ¶47. On March 7, 2018, Plaintiff saw HSU staff in connection with his new state-issued shoes. ECF No. 20, ¶130. Plaintiff reported that the shoes "feel much better." *Id*. HSU staff reminded Plaintiff that staff still had his custom-made orthotics; however, he declined to take them at that time. *Id*.

Through the spring and summer of 2018, Dr. Hoffman continued his attempts to get Plaintiff a surgical consultation, new shoes, gel inserts, existing shoe repair, shoe/arch support evaluation, and custom orthotics. *Id*., ¶131. But he could not unilaterally authorize surgery or force an orthopedic surgeon to perform surgery that he or she did not deem beneficial to the patient. *Id*., ¶132. He also did not have the knowledge and training to perform the surgery himself. *Id.*

In September 2018, Plaintiff transferred to the Fox Lake Correctional Institution (FLCI). ECF No. 37, ¶47. According to Plaintiff, "[a]s soon as I was transferred to Fox Lake Correctional Institution, I was scheduled to see a surgeon for a second opinion and then scheduled for surgery." *Id*., ¶150. More specifically, on November 16, 2018, Plaintiff was sent to Nova Care for orthotic inserts. *Id*., ¶47. At Nova Care, Bruce Russell (not a defendant) looked at Plaintiff's feet and stated that orthotics would not work for Plaintiff's deformed feet and that, "this is out of my scope of work." *Id*. Instead, Mr. Russell provided referrals to three surgeons who did foot reconstruction surgery: (1) Dr. Brian Law in Froedtert Hospital; (2) Dr. Sizewski at Aurora Health Care; and (3) Dr. Daniel Guelsdort. *Id*. On February 13, 2018, Plaintiff requested a consultation with Froedtert Hospital for a second opinion on foot surgery; and the following day, on February 14, 2018, the HSU at Fox Lake approved the requests. *Id*. Froedtert Hospital is the same hospital Dr. Hoffman had next on his list on his Class III request. ECF No. 26-1 at 52. Dr. Law at Froedtert Hospital then recommended surgery, which was also approved by HSU at Fox Lake. ECF No. 37, ¶47. Dr.

9

Law performed surgery on Plaintiff's left foot in January 2020 and his right foot in August 2022. *Id*. Both surgeries were successful and Plaintiff is now able to put his feet flat on the ground rather than walking on the inside of his feet. *Id*.

ICE Miller and Warden Strahota are not medical care professionals; and they did not provide any medical care in this case. ECF No. 20, ¶¶8-11. Their roles in this case were limited to reviewing four inmate complaints Plaintiff filed—NLCI-2017-22176, NLCI-2017-22181, NLCI-2017-25075, NLCI-2017-31295—in connection with denial of medical care for his feet and denying the inmate complaints because Plaintiff was receiving continuous medical care for his feet, as outlined in detail above. *Id*., ¶¶18-53. ICE Miller and Warden Strahota both indicate that, because they are not medical professionals, they defer to the expertise of medical staff. *Id*. Plaintiff states that ICE Miller did not allow pictures of his feet in his inmate complaint file allegedly because it "would be against her boss [Warden Strahota]." ECF No. 37, ¶50. And Warden Strahota never interviewed Plaintiff in person before reviewing his inmate complaint file. *Id*., ¶9.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth

specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id*. Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

**ANALYSIS**

To survive summary judgment on an Eighth Amendment deliberate indifference claim, Plaintiff must provide evidence from which a reasonable jury could conclude that: (1) he faced an objectively serious medical condition; and (2) Defendants subjectively knew about the medical condition and disregarded it. *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (citing *Arnett v. Webster*, 658 F.3d 742, 750, 751 (7th Cir. 2011)). The first, objective, element is satisfied by showing that Plaintiff suffered from a condition "that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010) (citing *Hayes v. Snyder*, 546 F.3d 516, 522 (7th Cir. 2008)). The second, subjective, element is satisfied by showing that a prison official "knows of a substantial risk of harm to an inmate and 'either acts or fails to act in disregard of that risk.'" *Gomez*, 680 F.3d at 865 (quoting *Arnett*, 658 F.3d at 750). This is a "high hurdle." *See Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012). It requires "something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Id*. (quoting *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006)). Plaintiff must show that Defendants' decision was "such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such

11

a judgment." *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008) (quoting *Collignon v. Milwaukee County*, 163 F.3d 982, 988 (7th Cir. 1998)).

In the prison medical care context, examples of deliberate indifference can include: (1) ignoring a request for medical assistance; (2) refusing to take instructions from a specialist (3) persisting in a course of treatment known to be ineffective; (4) choosing an easier and less efficacious treatment without exercising medical judgment; and (5) delaying in treatment which serves no penological interest. *Petties v. Carter*, 836 F.3d 722, 728-31 (7th Cir. 2016). The Court examines the totality of an inmate's medical care when analyzing deliberate indifference. *See Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997).

For purposes of this motion, the Court will presume that Plaintiff's deformed feet were an objectively serious medical condition. But based on the evidence in the record, no reasonable jury could conclude that Defendants were deliberately indifferent towards it.

## I.     ICE Miller and Warden Strahota

With respect to ICE Miller and Warden Strahota, their roles in this case were limited to reviewing four inmate complaints Plaintiff filed in connection with the denial of medical care for his feet; and denying the inmate complaints because Plaintiff was receiving continuous medical care for his feet, as detailed in the facts section above. ECF No. 20, ¶¶18-53. But individuals functioning as complaint examiners are not generally liable under §1983 for simply doing their jobs and ruling on inmate complaints and appeals. *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009).

In response, Plaintiff argues that, had ICE Miller and Warden Strahota either looked at Plaintiff's feet in person or looked at pictures of his feet, they would have known that surgery was immediately necessary and that the conservative treatment options he was receiving was

12

inadequate. ECF No. 36 at 6, 7, 11, & 12. But as non-medical professionals, ICE Miller and Warden Strahota did not have the expertise to diagnose Plaintiff themselves; and they were entitled to defer to the medical expertise of the medical professionals. *See Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) ("[T]he law encourages non-medical security and administrative personnel at jails and prisons to defer to the professional medical judgments of the physicians and nurses treating the prisoners in their care without fear of liability."). Toward that end, several different foot and medical professionals—i.e., a foot surgeon, an orthotist, and several different podiatrists—carefully examined Plaintiff's feet using their training, CT scans, and x-rays and all recommended conservative treatment. It's unclear how ICE Miller and Warden Strahota, as non-medical professionals, could have reasonably ignored their collective expertise and concluded otherwise based solely on "pictures." It bears noting that Plaintiff did not attach any pictures of his deformed feet to his response materials in an attempt to create a dispute of fact on this point anyway. *See* ECF Nos. 36-38.

Plaintiff argues that Warden Strahota ruled on his inmate complaints without ever personally interviewing Plaintiff. ECF No. 36 at 6, 7, 11, & 12. But, under the Inmate Complaint Review System (ICRS), the Warden, who serves as the Reviewing Authority, is not responsible for conducting investigation—that is the ICE's job. *See* Wis. Admin. Code DOC 310.10(7) ("The ICE shall have full access to the institution, inmates, employees, and department records to investigate the complaint."). Warden Strahota, as the Reviewing Authority, was entitled to rely on the record created by the ICE, *see* Wis. Admin. Code DOC 310.11, and he did so appropriately in this case. And, as a practical matter, Wardens are also very busy and neither have the time nor the responsibility to personally interview each of the hundreds of inmates who file an inmate complaint each year. This is precisely why the position of the ICE exists in the first place.

13

Plaintiff states that ICE Miller did not allow pictures in his inmate complaint file because it "would be against her boss." ECF No. 36 at 11 & 12. But, as noted above, any pictures of his feet would not have made a difference in light of the consistent recommendation of medical professionals to pursue conservative treatment. Plaintiff's suspicion or hunch that ICE Miller was refusing to place photos in his inmate complaint file as a cover-up plot to deny surgery is not enough to survive summary judgment. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) ("Here, all the plaintiffs have to go on is a collective hunch about the defendant's motives, which in itself will not survive a motion for summary judgment.").

Finally, Plaintiff appears to imply that ICE Miller and/or Warden Strahota should have personally made phone calls themselves to find other surgeons willing to conduct Plaintiff's foot surgery. ECF No. 36 at 11. But "[b]ureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job." *Burks*, 555 F.3d at 595. "The division of labor is important not only to bureaucratic organization but also to efficient performance of tasks; people who stay within their roles can get more work done, more effectively, and cannot be hit with damages under §1983 for not being ombudsmen." *Id*. Medical care staff are responsible for finding medical referrals because it is in their expertise. ICE Miller and/or Warden Strahota were not obligated to pick up the phone and do that themselves. They are entitled to summary judgment.

## II.     HSM Warner and Dr. Hoffman

With respect to HSM Warner and Dr. Hoffman, they provided continuous medical care for Plaintiff's feet while he was at the NLCI. As detailed in the facts section above, treatment included: numerous in person medical appointments; numerous referrals to off-site foot experts (i.e. surgeons, orthotists, and podiatrists); medical restrictions (i.e. use of a bike, lower bunk, and lower tier); different types of shoes (i.e. work boots, high-tops, Velcro straps); different types of

14

inserts (i.e. gel and memory foam); shoe gears; shoe adjustments; custom orthotics; physical therapy; Tylenol; a tub to soak feet; a warm compress; the option for a talonavicular joint anesthetic and steroid injection; a Class III request for surgery; and communication with BHS regarding the possibility of surgery. Plaintiff also rejected several in-person medical appointments, rejected orthotics, and refused the talonavicular joint anesthetic and steroid injection because he was not in pain on the day it was scheduled. Based on Plaintiff's voluminous medical record alone, no reasonable jury could conclude that HSM Warner and Dr. Hoffman were deliberately indifferent.

In response, Plaintiff argues that HSM Warner and Dr. Hoffman did not diligently or enthusiastically pursue the only effective treatment: foot surgery. ECF No. 36. He appears to believe that they were discouraging surgery or doing everything they could to prevent surgery. *Id*. But that position is not supported by the record. Warner, as HSM, did not have the authority to order surgery. ECF No. 20, ¶4. She is not responsible for the doctors' decisions to try conservative treatment. And although she could not order surgery herself, HSM Warner contacted BHS in January 2018 to ask about surgical options for Plaintiff, and they directed her back to conservative options. As for Dr. Hoffman, he *did* pursue surgical options beginning as early as 2014. He sent Plaintiff to a surgical consultation with Dr. Williams in October 2014 and she ultimately refused surgery in June 2017 because: (1) Plaintiff reported intermittent pain, which in her opinion would make surgery response less predictable; (2) Plaintiff reported that a non-operative treatment (i.e. shoes that "felt like heaven") improved his symptoms; and (3) Plaintiff was unable to complete the talonavicular joint anesthetic and steroid injection required to pin-point the specific location of the pain in his foot. When Dr. Williams refused surgery based on her medical judgment, Dr. Hoffman contacted two other surgeons (Dr. Kurt Rongstad and Dr. Ronald Guiao), neither of whom agreed to conduct surgery. Dr. Hoffman then filed a Prior Authorization for Therapeutic

15

Level of Care Referral to the Class III committee for more guidance on surgical options. Dr. Hoffman was contemplating contacting a different surgeon in Froedtert Hospital, when the Class III committee directed him back to conservative treatment options as recommended by every specialist Plaintiff had seen prior to that point in time. Any assertion that Dr. Hoffman and/or HSM Warner did not take action to get surgery approved is not supported by the overwhelming record.

Plaintiff's main gripe in this case appears to be the fact that he received surgery "[a]s soon as [he] was transferred to Fox Lake Correctional Institution." ECF No. 37, ¶47. From this, he develops 20/20 hindsight suggesting that every Provider who worked on his case *before* Fox Lake was being deliberately indifferent because all it took for Dr. Law to approve surgery was "looking" at his feet. As a preliminary matter, Plaintiff has not attached any medical records from Dr. Law explaining his diagnosis and treatment. *See* ECF Nos. 36-38. Plaintiff's own interpretation of Dr. Law's medical thought process is not enough to survive summary judgment. Plaintiff also does not have a declaration or affidavit from Dr. Law stating that all it took was one look at his feet to know that any treatment other than surgery would be such a "substantial departure from accepted professional judgment, practice, or standards" that medical judgment was not actually used. Plaintiff suspects that all it took was "looking" at his feet, but more likely, Dr. Law looked at his entire medical history, saw that he had exhausted all other conservative treatment options, then agreed to conduct surgery as the last remaining treatment option. Moreover, physicians often come to different conclusions about treatment. In a complicated case like this, there is not a zero-sum universe in which one course of treatment is "correct" while everything else is wrong. All the doctors discussed herein appear to have acted well within medical norms.

16

Plaintiff also notes that Dr. Law was willing to conduct surgery without pin-pointing the precise location of his pain; and that Dr. Law did not use a "a two-stage procedure" that included realignment then fusion. ECF No. 36. Plaintiff therefore believes that Dr. Williams' conclusions about the need, effectiveness, and safety with surgery were all wrong. *Id*. But, as noted above, Dr. Williams used her medical judgement in arriving at the conclusion that a two-step procedure with specific information about the location of the pain was required to conduct surgery safely. Even assuming Dr. Law disagreed with Dr. Williams' conclusion—and there is no evidence that he did—disagreement among medical professionals on the use of medical judgment is not deliberate indifference. *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014).

Finally, the record also shows that Plaintiff had some behavioral problems. Plaintiff admits that he was "angry and argumentative because [he] needed surgery," *see* ECF No. 37, ¶121, and he suspects that Providers' personal gripes with him prevented surgery. Plaintiff notes, for example, that Dr. Hoffman stated in his Class III request that Plaintiff might have "burned his bridges" with his behavior and attitude. *See* ECF No. 26-1 at 52. Behavior issues among prisoners are not uncommon; and most medical staff are used to disgruntled patients, whether or not they are incarcerated. It is clear from the record in this case that the individuals who treated him used their medical judgment in arriving at their conclusions. Provider notes about prisoner behavior does not on its own show deliberate indifference, especially when treatment is being offered. Plaintiff did not have a constitutional right to demand specific treatment, *see Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997), despite his demand for surgery from the very beginning of the case. "[T]he Constitution is not a medical code that mandates specific medical treatment." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996).

17

In the end, Plaintiff vigorously asserts that his foot deformity was so obvious that anyone—medical and non-medical professionals—should have immediately known that surgery was the only reasonable treatment option by simply looking at his feet. But he has neither attached pictures of his foot deformity from which the Court could assess that statement nor has he attached his medical records or a declaration/affidavit from Dr. Law stating that all it took was one look at his feet to know that any treatment other than surgery would be inappropriate. Based on the totality of the record, no reasonable jury could conclude that Defendants failed to use their medical judgment and were deliberately indifferent when treating Plaintiff's medical condition. Because Plaintiff cannot prevail on his Eighth Amendment deliberate indifference claim, the Court relinquishes jurisdiction over his state law negligence claim. *Leister v. Dovetail, Inc.*, 546 F.3d 875, 882 (7th Cir. 2008) (noting that "when the federal claim in a case drops out before trial," a district court usually "relinquish[es] jurisdiction over any supplemental claim to the state courts."). Accordingly, Defendants are entitled to summary judgment and the court will dismiss this case.

### CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' motion for summary judgment (ECF No. 19) is **GRANTED**; and this case is **DISMISSED**. The clerk is directed to enter judgment accordingly.

**IT IS FURTHER ORDERED** that Defendants' motion to dismiss for lack of jurisdiction (ECF No. 29) is **GRANTED**.

Dated in Milwaukee, Wisconsin this 31stst day of March, 2026.

STEPHEN C. DRIES
United States Magistrate Judge

18

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $605.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serious physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.